## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL P. RIES and         :
AMY J. RIES, h/w,           :
                           :     CIVIL ACTION
         Plaintiffs,     :
                           :
    v.                :
                           :     NO.   13-1400
CRAIG T. CURTIS and SUSAN L.  :
CURTIS, h/w, et al.         :


## MEMORANDUM

BUCKWALTER, S. J.                                 October 22, 2014

      Currently pending before the Court are: (1) the Motion for Summary Judgment of Defendants Fox & Roach LP and Nancy Presti; (2) the Motion for Summary Judgment of Defendant American International Relocation Solutions, LLC; (3) the Motion for Summary Judgment of Defendants Craig T. Curtis and Susan L. Curtis; and (4) the Motion for Partial Summary Judgment of Plaintiffs Michael P. Ries and Amy J. Ries.  For the following reasons, the Motion of Michael and Amy Ries and the Motion of Craig and Susan Curtis are denied in their entireties, and the Motion of American International Relocation Solutions, LLC and the Motion of Fox & Roach LP and Nancy Presti are granted in their entireties.

## I.     FACTUAL BACKGROUND[1]

      The present lawsuit arises from the sale and purchase of a property at 8 Sunrise Drive, Doylestown, Pennsylvania (the "Property"), a home constructed in 1842.  On August 19, 2006,

---

[1]  To the extent the Court cites the Complaint for any statement of fact, that allegation is undisputed.

Defendants Craig and Susan Curtis (the "Curtises" or the "Curtis Defendants") purchased the Property and resided therein until just before August 2011.  (Compl. ¶ 12; Curtis Answer ¶ 12.) Sometime prior to May 4, 2011, Susan Curtis accepted a position with Dal-Tile, a carpet manufacturer in Georgia, requiring the Curtises to relocate to an area nearby.  (Pls.' Mem. Supp. Mot. Summ. J. 2.)  In connection with the relocation, Mohawk Industries, Inc. ("Mohawk"), the parent of Dal-Tile, agreed to pay for certain expenses incurred in connection with the sale of the Property.  (Id.)

On an unknown date in 2011, the Curtises listed the Property for sale with Defendant Nancy Presti ("Presti"), a realtor employed by Defendant Fox & Roach LP ("Fox & Roach"). (Compl. ¶ 15; Presti and Fox & Roach Answer ¶ 15; Curtis Answer ¶ 15.)  On May 4, 2011, Defendant American International Relocation Solutions, LLC ("AIReS")) began to assist the Curtises in finding a buyer for the Property.  Denise Stover, an AIReS program manager, intended to purchase the Property from the Curtises and then immediately transfer the Property to an identified buyer to avoid the Curtises being taxed on payments from Mohawk.  (Pls.' Resp. Opp'n  Fox & Roach Mot. Summ. J., Ex. A.)

On July 9, 2011, the Curtises prepared a Seller Property Disclosure Statement to be provided to prospective buyers of the property.  (Def. Curtis Mot. Summ. J., Ex. 5.)  The form was originally provided to the Curtises by Defendant AIReS.  (Def. Curtis Mot. Summ. J., Ex. 6, Dep. of Denise Stovers ("Stovers Dep."), 35:16–24, Jan. 31, 2014.)  The Seller's Disclosure contained the following questions, all of which the Curtises answered with an "x" in the "No" box:

6(a)     Are you aware of any past or present water leakage in the house or structures?

. . .
6(f)    Are there any defects in flooring including stains?
. . .
13(e)    Do you know of any past or present drainage or flooding problems affecting the property?

(Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 5.)  The same questions were asked and identically answered on a July 20, 2011 Seller's Property Disclosure Statement provided to the Cutises by Presti.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 7.)  This latter Statement also had multiple questions specifically addressing water infiltration in basements and crawl spaces, to which the Curtises answered "Yes" as follows:

4(a)    Does your property have a sump pump?
4(b)    Are you aware of any water leakage, accumulation, or dampness within the basement or crawl space?
4(c)    Do you know of any repairs or other attempts to control any water or dampness problems in the basement or crawl space?

(Id.)  When asked to explain the "yes" answers, the Curtises stated, "French drains and 3 sump pumps installed by previous owner for water seepage."  (Id.)

During their ownership of the Property, water had infiltrated under the door of the Property two or three times.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 8, Dep. of Craig Curtis ("C. Curtis Dep."), 24:4–24, Feb. 11, 2014.)  Mr. Curtis had drilled holes in the kitchen floor in front of the door to allow water to drain into the crawl space.  (Compl. ¶ 24; Curtis Answer ¶ 24; C. Curtis Dep. 24:4–24.)

The Curtises moved out of the Property at the end of July 2011 and the Property remained vacant until 2012.  (Compl. ¶ 25.)  Late on Saturday, August 27, 2011, Hurricane Irene struck the east coast of the United States.  In an AIReS Marketing Update Report from Monday, August 29, 2011, Presti advised AIReS, in the section of the report entitled "Items requiring immediate

attention," that she would "Check for damage from Hurricane — Tuesday August 30." (Pls.'
Resp. Opp'n Presti and Fox & Roach Mot. Summ. J., Ex. D.) In the "Marketing Obstacles"
section of the report, she noted, "No new issues except check for damage to home from
hurricane.  Home is not occupied." (Id.) The record contains no evidence of any follow-up
reports.

On September 6, 2011, Stover faxed to Fox & Roach (a) an AIReS Addendum to
Purchase & Sale Agreement ("AIReS September 6th Addendum,"); (b) a state Disclosure form
signed by AIReS; (c) the AIReS disclosure form signed by the Curtises; and (d) a state disclosure
form signed by the Curtises. (Pls.' Mot. Summ. J., Ex. B.)  The fax cover sheet stated:

> PLEASE NOTE: The Addendum to Purchase & Sale Agreement MUST be
> referenced as an integral part of any offer presented and signed by the buyer.  Any
> disclosure forms completed by the current homeowner should also be presented to
> the prospective buyer for informational purposes.

(Id.) Page two of the AIReS September 6th Addendum stated the following:

> A.    Title company: The company to issue the title insurance policy shall be:
>        Larrabee & Cunningham
> B.    Title/Closing Contact: Anna 215-546-8600
> C.    Closing: The closing shall be through the agency listed above for Title.

(Id.)

Plaintiffs Michael and Amy Ries were shown the Property in November 2011 and were
provided with the Curtises' two Seller Disclosure Statements. (Compl. ¶ 26.)  According to
Plaintiffs, the holes in the kitchen floor were covered with a mat. (Id. ¶ 27.)  At his deposition,
however, Mr. Ries could not recall seeing any mats or rugs near the back kitchen floor. (Def.
Fox & Roach's Mot. Summ. J., Ex. 11, Dep. of Michael Ries ("M. Ries Dep."), 32:2–18, Feb.
12, 2014.)  Additionally, Mr. Ries went into the basement of the house, but did not recall seeing

4

anything that caused him concern with any moisture, rot, or dampness in the basement.  (Id. at 32:19–33:19.)  On November 3, 2011, Plaintiffs submitted an offer to purchase the Property listing the Curtises as the Property seller.  (Compl. ¶¶ 28–29.)  The Curtises rejected this offer and the Property remained unsold and vacant through February 2012.  (Id. ¶¶ 30–31; Def. Curtis Answer ¶¶ 30–31.)

    In March 2012, Defendant Presti again showed the Property to Plaintiffs.  (Compl. ¶ 32; Presti and Fox & Roach Answer ¶ 32.)  On March 20, 2012, Plaintiffs as buyers and Defendant AIReS as seller entered into the Agreement of Sale ("AOS") for the subject Property with a purchase price of $715,000.00.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 12.)  The AOS included a RE/MAX Disclosure Addendum ("RE/MAX Addendum") and an American International Relocation Solutions Addendum to Purchase and Sale Agreement ("AIREeS March 20th Addendum"), which were executed by Plaintiffs contemporaneously with their execution of the AOS.  (Pls.' Mot. Summ. J., Ex. C.)  The AIReS March 20th Addendum included a clause that provided that "[t]he terms and conditions of this agreement, which apply to the seller [AIReS], are subject to the seller becoming contractual owner" of the property.  (Id.)  AIReS's purchase of the home from the Curtis Defendants was finalized on or about April 20, 2012, thereby satisfying the clause and enabling AIReS to complete the sale of the home to the Rieses.  (Def. AIReS Mot. Summ. J., Ex. D.)  The AIReS March 20th Addendum also included three Sellers' Disclosure Statements, including the aforementioned July 7, 2011 and July 20, 2011 disclosures prepared by the Curtises, as well as the third disclosure, dated September 6, 2011, prepared by AIReS.  (Pls.' Mot. Summ. J., Ex. C.)  The AIReS disclosure, which was signed by the Rieses, included a stamp that appeared ten times throughout the document, stating as follows:

We are a relocation company, and as such we have never occupied this property. We make no guarantees, warranty, or representation about the condition of this property. American International Relocation Solutions, LLC.

(Id.) The AIReS March 20th Addendum further provided:

The above documents [sellers' disclosures] are being given to Buyer for informational purposes only. They represent the opinions of the individuals or firms who prepared them. Seller makes no representations as to the accuracy of the information given and makes no agreement to undertake or perform any action recommended in any of the reports.

. . .

**Buyers' Duty to Inspect/Test:** Buyer agrees to inspect or to have the Property Inspected by others on Buyer's behalf to determine the existence of defects, if any. All and any inspections shall be at Buyer's sole cost and expense. Seller encourages Buyer to secure such surveys, professional building inspection reports, any inspections or reports necessary to determine the presence of radon gas, asbestos, mold, synthetic stucco, or other toxic or hazardous substance in or about the Property, and other reports and inspections are appropriate to determine the condition of the Property.

. . .

**Settlement as Final:** Buyer's (a) failure to notify Seller in writing of any defects within the time limits provided in this Rider or (b) acceptance of the Deed at settlement shall constitute Buyer's full acceptance of the condition of the Property and a waiver of Buyer's rights to object to its condition or assert any claim related to the Property at any time in the future. This provision shall survive delivery of the Deed and the closing.

(Id.) Finally, the AIReS March 20th Addendum indicated that Plaintiffs were responsible for ordering title insurance. (Def. AIReS Mot. Summ. J., Ex. G.) It again indicated that "[t]he company to issue the title insurance policy shall be: Larrabee & Cunningham." (Id.).

In contrast to the AIReS March 20th Addendum, however, the RE/MAX Addendum included with the AOS stated that the company Camelot Abstract was available for such insurance at a cost of $3,650, but emphasized that Plaintiffs were not required to use Camelot Abstract. (Id.) Ultimately, Plaintiffs selected Penn Land Transfer Company ("PLTC") as their title insurance company, at a cost of $3,209.50. (Compl. ¶ 49.) On March 23, 2012, following

6

some additional negotiations as to the sale price, Stover, as representative of AIReS, signed the

AOS, the AIReS March 20th Addendum, and RE/MAX Disclosure Addendum.

On March 29, 2012, Plaintiffs hired Homestead Inspections, Inc. to conduct the home

inspection within the contingency provided in the Agreement of Sale.  (Defs. Presti and Fox &

Roach's Mot. Summ. J., Ex. 13 ("Minnucci Report").)  Neil Minnucci, a home inspector

employed by Homestead Inspections, performed an inspection of the Property on March 29,

2012, and took photographs of the Property to be used in his report.  (Id.)  Under the heading

"Report Summary," Mr. Minnucci stated:

> BASEMENT/CRAWL SPACE:
> Moisture/Rot noted, Damage noted, Poor end bearing is found.  Improper structural
> repairs have been made.
>
> Old growth lumber boards are used.  A qualified carpentry contractor should be
> called to make further evaluation and repair as needed.  Moisture/Rot noted, Damage
> noted.

(Pls.' Resp. Opp'n Presti and Fox & Roach Mot. Summ. J., Ex. N.)  Additionally, under the

heading, "Items Needing Attention," Mr. Minnucci remarked:

> GRADING:
> There are areas around the perimeter of the house that slope towards the structure.
> This condition makes the home susceptible to water entry.  Pitch slope of soils away
> from foundation.  Slope should fall away from the foundation at a minimum of ½
> inch per foot and extend at least 10 feet away from the foundation.  If grading is not
> practicable, then drainage work would be needed.

(Id.)

Following Mr. Minnucci's inspection, Plaintiffs had the Property inspected by John

Moffatt, Jason Burnitskie, and John Reichner so that they could provide estimates for necessary

repairs to the home.  (M. Ries Dep. 199:5–25.)  Mr. Reichner specifically indicated that there

7

was water damage to the joists of the basement.  (Id. at 200:2–16.)  At his deposition, Mr.

Reichner stated that he knew the basement had water coming in it from the porch prior to

Plaintiffs' purchase of the Property, but could not remember whether he saw the holes in the

kitchen prior to the sale.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 14, Dep. of John

Reichner ("Reichner Dep."), 24:3–23, Oct. 24, 2013.)  On April 5, 2012, Reichner provided

Plaintiffs with estimates for the repair of the Property, including repair of wet joists in the

basement.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 15; M. Ries Dep. 72:18–23.)

Plaintiffs also had John Moffatt inspect the Property on April 5, 2012.  Mr. Moffatt

observed rotted joists sistered with some makeshift columns in the basement and noted that the

end of the joist under the kitchen along the back wall was rotted out by water.  (Defs. Presti and

Fox & Roach's Mot. Summ. J., Ex. 16, Dep. of John Moffatt ("Moffatt Dep."), 19:11–15,

23:11–17, Feb. 28, 2014.)  Mr. Moffatt's April 5, 2012 proposal suggested: "Repair Floor joists

on left side of basement behind steps.  Original floor joist on first floor rotted at wall pockets.

Ten joists were sistered and beans and columns were installed improperly."  (Defs. Presti and

Fox & Roach's Mot. Summ. J., Ex. 17.)

Upon receipt of foregoing repair estimates, Mr. Ries sent a letter to the "Sellers," dated

April 5, 2012, stating as follows:

Dear Sellers,

Following inspections of your property at 8 Sunrise Drive, below is a list of critical
health and safety related repairs that require immediate attention.

1)      Radon: 3x the acceptable EPA limitations.
2)      Mold: Located in the third floor attic, ceiling, and HVAC system.
3)      Asbestos: Exposed asbestos located on the basement heating pipes.
4)      Structural: Basement beam and column deterioration/improper support.

8

5)      Stucco: Exterior delaminating from the base structure (side of house over kitchen).

The attached estimates outline the extent of repair needed for the above 5 items.  We are requesting that the necessary corrective actions occur prior to our agreed upon closing date, using a contractor approved by both parties.

An additional list of non-health/safety property repairs that have been identified during home inspection is attached.  We are absorbing the cost and responsibility of these additional repairs.

We are hopeful that we can reach an agreement.

(Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 18.)  Defendants Craig and Susan Curtis did not agree to any of the repairs.  On April 14, 2012, however, Defendant AIReS agreed to repair the refrigerator in the kitchen and remediate the radon by providing a credit at settlement, a majority of which was funded by the realtors.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Exs. 19–20.)  Mr. Ries confirmed that the negotiations came down to the Sellers' agreement to repair the refrigerator and either pay for or give the credit for radon, with no resolution on any of the other repairs.  (M. Ries Dep. 91:14–25.)

On May 29, 2012, Plaintiffs closed on the purchase of the Property.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 21.)  During the following summer, Plaintiffs had several instances of rain coming into the kitchen.  When they moved the mat by the door, they noticed the holes that had been drilled in the floor.  (M. Ries Dep. 101:1–14; Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 22.)

Plaintiffs initiated the current litigation on March 18, 2013, setting forth multiple causes of action as follows: (1) violation of 12 U.S.C. § 2608 against Defendants AIReS and Curtis for requiring that title insurance be purchased from Larrabee Cunningham; (2) violation of 12 U.S.C.

§ 2607 against Defendants AIReS and PLTC for failing to give notice of affiliated business arrangement; (3) violation of 68 Pa.C.S. § 7303 against Defendants Curtis, AIReS, Presti, and Prudential for failing to disclose a material defect; (4) violation of the Pennsylvania Unfair Trade Practices Act and Consumer Protection Law against Defendants Curtis, AIReS, Presti, Prudential, and PLC; (5) fraud against Defendants Curtis, AIReS, Presti, and Prudential; and (6) fraud against Curtis, AIReS, Larrabee, and PLTC.  On June 25, 2014, the parties filed the following: (a) a Motion for Summary Judgment by the Curtis Defendants; (b) a Motion for Summary Judgment by Defendants Fox & Roach and Presti; (c) a Motion for Summary Judgment by Defendant AIReS, and (d) a Motion for Partial Summary Judgment by Plaintiffs against Defendant AIReS.  Plaintiffs filed Responses to Defendants' Motions on July 9, 2014, and Defendant AIReS filed a Response to Plaintiffs' Partial Summary Judgment Motion on July 21, 2014.  Defendants Fox & Roach and Presti filed a Reply Brief on July 14, 2014, and Defendant AIReS filed a Reply Brief on July 22, 2014.  These Motions are now ripe for judicial consideration.

## II.      STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.
Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the
disputed evidence and decide which is more probative, or to make credibility determinations.
Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA
Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court
must consider the evidence, and all reasonable inferences which may be drawn from it, in the
light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg
Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact,
it need not "support its motion with affidavits or other similar materials negating the opponent's
claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing
out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at
325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the burden at trial,"
summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of
some evidence in support of the non-movant will not be adequate to support a denial of a motion
for summary judgment; there must be enough evidence to enable a jury to reasonably find for the
non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.    THE CURTIS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Craig and Susan Curtis seek summary judgment on the three counts against
them—Counts III, IV, and V—in Plaintiffs' Complaint.  These counts allege a violation of 68

11

Pa.C.S. § 7303, a violation of the Pennsylvania Unfair Trade Practices Act and Consumer

Protection Law, and fraud respectively.  The Court addresses each claim individually.

   A.   **Pennsylvania Real Estate Disclosure Law Claim**

   Plaintiffs first contend that the Curtis Defendants violated 68 Pa.C.S. § 7303 of the

Pennsylvania Real Estate Disclosure Law, which obligates sellers of residential real estate to

inform home buyers of material defects known to the sellers.  Specifically, the Complaint alleges,

in pertinent part, as follows:

> 70.   In July 2011 when Curtis prepared Property Disclosure Statements for AIReS and Presti, Curtis knew that substantial amounts of water entered the kitchen during rain storms.

> 71.   Upon information and belief, between the time Curtis moved out of the Property and March 2012, AIReS, Presti and Prudential became aware of the fact that substantial amounts of water entered the kitchen during rain storms.

> 72.   Upon information and belief, between the time Curtis moved out of the Property and March 2012, AIReS, Presti and Prudential arranged to have areas of the kitchen and adjoining rooms repainted to conceal evidence of water damage.

> 73.   Before Ries offered to purchase the Property in March 2012, Curtis, AIReS Presti and Prudential knew that the representations in the AIReS Property Disclosure Statement set forth in ¶¶ 16 through 19 above and similar representations in the Presti Property Disclosure Statement were false.

> 74.   Neither Curtis, AIReS, Presti nor Prudential corrected the misrepresentations in the Property Disclosure Statements before Ries agreed to purchase the Property.

> 75.   Experts have advised Ries that because of the improper construction of the rear patio, rain water flows towards the house and under the rear door into the kitchen.

> 76.   Ries also has been advised that pooling water on the patio has caused damage to the frame of the rear kitchen door.

(Compl. ¶¶ 70–76.)

Under the Pennsylvania Real Estate Seller Disclosure Law ("RESDL"):

Any seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement which satisfies the requirements of section 7304 (relating to disclosure form).   A signed and dated copy of the property disclosure statement shall be delivered to the buyer in accordance with section 7305 (relating to delivery of disclosure form) prior to the signing of an agreement of transfer by the seller and buyer with respect to the property.

68 Pa. Cons. Stat. § 7303.  Among the subjects that require disclosure are structural problems, water and sewage systems or service, and soils, drainage and boundaries.  Id. § 7304.  The statute goes on to provide that:

The seller is not obligated by this chapter to make any specific investigation or inquiry in an effort to complete the property disclosure statement.  In completing the property disclosure statement, the seller shall not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive or misleading and shall not fail to disclose a known material defect.

Id. § 7308.

The Curtis Defendants now put forth three arguments in response to Plaintiffs' allegations.  First, they argue that the improper slope of the patio, not water seeping under the door, is the material defect on the Property.  They claim that Plaintiffs have produced no evidence to prove that the Curtises knew the cause of water seepage under the kitchen door or that they made any efforts to ascertain that cause.  They assert that, in the absence of such knowledge, they could not have intentionally concealed the material defect.  In their second argument, the Curtis Defendants contend that the actual defect—the condition of the patio and door—were not hidden from Plaintiffs by the Curtises since both conditions were open and obvious.  Thus, the alleged failure to disclose that water came under the door from a negative

13

slope in the patio did not, according to the Curtises, preclude either condition from being identified during the inspections.  Finally, the Curtises aver that, to the extent Plaintiffs are entitled to damages from the failure to disclose, Plaintiffs have limited their damages to the cost to repair of the patio and the door frame.

The Court finds none of these arguments convincing.  Primarily, the Curtis Defendants incorrectly, and without legal basis, define a "material defect" as the cause of a particular problem, as opposed to the problem itself.  This argument is quickly disposed of by reference to the definition of "material defect" set forth in the statute.  For purposes of the RESDL, the term "material defect" is defined as "[a] problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property."  See 68 Pa. Cons. Stat. § 7102 (definitions provided in Section 7102 extend to all of Part III of Title 68); see also Milliken v. Jacono, 60 A.3d 133, 138 (Pa. Super. Ct. 2012), aff'd, 96 A.3d 997 (Pa. 2014).  Nothing in the RESDL limits the duty of disclosure to when the seller knows the cause of the problem.  Given this clear definition, the seepage of water under the kitchen door was, in and of itself, a material defect of which the Curtises were admittedly aware.  The mere fact that they did not investigate the cause of that seepage cannot insulate them from their duty to disclose the problem.

Second, the Court finds no more merit to the Curtis Defendants' argument that the condition of the patio and door were open and obvious and, thus, obviated the Curtises' obligation to disclose the material defect.  Nothing in the statute limits the duty of disclosure to non-obvious defects.  Rather, it requires that the seller "disclose to the buyer ***any*** material defects with the property known to the seller."  68 Pa. Cons. Stat. § 7303 (emphasis added).  This

14

disclosure must be made and given to the buyer "prior to the signing of an agreement of transfer by the seller and buyer with respect to the property."  Id.  Indeed, the Curtis Defendants' argument that the alleged defect with the patio should have been known to Plaintiffs through their inspector is contradictory.  On one hand, the Curtises argue that, despite living in the Property for five years and dealing with water seepage issues, they remained unaware of the negative slope of the patio.  On the other hand, they assert that Plaintiffs, after only several short visits to the Property and a home inspection, should have been aware of the problem.  Given the pure illogicality of this reasoning, Court rejects this argument.

Finally, the Curtis Defendants assert that, assuming they are liable under this provision, Plaintiffs' damages are limited.  Primarily, they contend that to the extent Plaintiffs seek damages for the damage caused to structures in their basement, such damages are unavailable because (1) the Curtis Defendants had no knowledge that the water infiltration under the door was causing damage in the basement; and (2) they disclosed that there was water seepage in the basement and that they had installed a drain and sump pump.  Moreover, although the Complaint identifies the damages resulting from this improper disclosure to "the cost of repairing the patio and replacing the rear kitchen door," in the amount of $46,106.75, (Compl. ¶ 77), Plaintiffs have failed to establish that these were "consequential damages" that were suffered in reliance upon the Defendants' misrepresentation.  Rather, they aver that the condition of the patio was a preexisting condition that allowed water to flow to the house and that the damage to the door frame was something that the home inspector mentioned in his report—neither of which were

"consequential damages suffered in reliance on the defendant's misrepresentation."[2]  (Def. Curtis

Mem. Supp. Summ. J. 15.)

The RESDL, however,  provides that:

A residential real estate transfer subject to this chapter shall not be invalidated solely because of the failure of any person to comply with any provision of this chapter. However, any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter shall be liable in the amount of ***actual damages suffered by the buyer as a result of a violation*** of this chapter. This subsection ***shall not be construed so as to restrict or expand the authority of a court to*** impose punitive damages or ***apply other remedies applicable under any other provision of law.***

68 Pa. Cons. Stat. § 7311(a) (emphasis added).  Thus, contrary to the Curtis Defendants'

argument, Plaintiffs are not limited to consequential damages suffered in reliance on Defendants'

misrepresentation, but rather may recover any actual damages suffered as a result of Defendants'

violation of the RESDL.  Plaintiffs argue that "[b]ecause Curtis violated the RESDL by failing to

disclose that water entered the Property under the kitchen door, Ries signed an Agreement of

Sale and purchased a home with an improperly constructed patio, a damaged kitchen door, a

damaged kitchen floor and damaged floor joists on the first floor of the Property."  (Pls.' Resp.

Opp'n Curtis Mot. Summ. J. 11.)  To the extent Plaintiffs can prove that their claimed damages

were "as a result of" the Curtis Defendants' violation, they may recover such damages under the

RESDL.

---

[2]  The Curtis Defendants cite two cases for the proposition that Plaintiffs are limited to consequential damages, which are those damages suffered in reliance on the defendant's misrepresentation.  Notably, however, neither case cited involved a cause of action under 68 Pa.C.S. § 7303.  See Sands v. Forrest, 434 A.2d 122, 124 (Pa. Super. 1981) (trespass action for fraud and deceit); Silverman v. Bell Sav. & Loan Ass'n, 533 A.2d 110, 116 (Pa. Super. 1987) (action to rescind a real estate transaction because of fraud).  Cases involving fraud actions are not instructive as to the damages recoverable in an action under the RESDL.

In short, the Curtis Defendants have not established the absence of a genuine issue of material fact as to either their liability or damages under Plaintiffs' RESDL claim against them. Accordingly, they are not entitled to summary judgment on this claim.

**B.      Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim**

The Curtis Defendants next challenge Count IV of Plaintiffs' Complaint against them, which asserts a claim for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  In particular, the Complaint alleges that the Curtises violated the UTPCPL by "[e]ngaging in other deceptive conduct which created the likelihood of confusion or of misunderstanding by Ries as to whether the Property suffered from any material defects." (Compl. ¶ 88(d).)[3]

The UTPCPL prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. § 201–3.  The statute prohibits, in the so-called "catchall" provision, "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce. 73 Pa. Stat. § 201–2(4)(xxi).  To state a plausible claim under the UTPCPL, the Complaint must allege that: "(1) [Plaintiff] purchased or leased goods or services primarily for a personal, family, or household purpose; (2) [Plaintiff] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL."

---

[3]  The Complaint also alleged that the Curtises caused the likelihood of confusion or of misunderstanding as to the ownership of the Property prior to Plaintiffs' purchase.  (Compl. ¶¶ 88(a)–(c).)  In its Response to the Curtises' Motion for Summary Judgment, however, Plaintiffs acknowledge that since the filing of the Complaint, Defendant AIReS delivered to Plaintiffs a Quitclaim Deed conveying its interest in the Property to Plaintiffs.  As a result, "Plaintiffs . . . are no longer pursuing their claims related to the ownership of the Property at the time of the sale." (Pls.' Resp. Opp'n Def. Curtis Mot. Summ. J. 11 n.25.)

<u>Baynes v. George E. Mason Funeral Home, Inc.</u>, No. Civ.A.09–153, 2011 WL 2181469, at *4
(W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. § 201–9.2(a)).  The Complaint must also allege that
Plaintiff justifiably relied on the deceptive conduct.  <u>See</u> <u>Hunt v. U.S. Tobacco Co.</u>, 538 F.3d
217, 224 (3d Cir. 2008) (concluding that "plaintiffs alleging deceptive conduct under the . . .
catchall provision must allege justifiable reliance").  In other words, the Complaint must
plausibly claim that knowledge of the deceptive conduct "would have changed [Plaintiff's]
conduct."  <u>Id.</u> at 227.  "[T]he UTPCPL is to be liberally construed to effectuate its objective of
protecting the consumers of this Commonwealth from fraud and unfair or deceptive business
practices."  <u>Ash v. Cont'l Ins. Co.</u>, 932 A.2d 877, 881 (Pa. 2007).

The Curtis Defendants now assert that Plaintiffs have not proven and cannot prove
deceptive conduct, justifiable reliance, or ascertainable loss.  The Court addresses each element
separately.

## 1.   **Deceptive Conduct**

The Curtis Defendants first assert that Plaintiffs have failed to produce sufficient
evidence to support any deceptive act under the UTPCPL.  They argue, somewhat baldly, that
"[e]ven if it is assumed that the questions on the disclosure form should have prompted the
Curtises to state that water had seeped under the door during a rainstorm, the Rieses cannot
demonstrate that the failure to include this on the disclosure form is an 'act of intentionally
giving false impression' or a 'false representation made knowingly or recklessly with the intent
that the Rieses would detrimentally rely upon it.'" (Def. Curtis Mem. Supp. Summ. J. 17.)  They
point to Mr. Curtis's deposition where, when questioned as to why he checked "no" next to the
box on the Disclosure Form which asked if there was "past or present leakage in the house or

other structures," he explained that he understood the term "leakage" to mean a repeated or ongoing problem with water leaking in the home and did not consider the occasions where water seeped in through the door as a "water leakage" problem.  (C. Curtis Dep. 58:15–23.)  The Curtises disclosed the circumstances of "seepage" in other portions of the home, thus demonstrating that they understood the need to reveal water issues.  The Curtis Defendants go on to argue that it is Plaintiffs' responsibility to prove that Mr. Curtis intentionally gave a false impression or did so with the intent to deceive Plaintiffs and that they have failed to do so.

The Court, however, finds that the question of Mr. Curtis's intent remains a question for a trier of fact.  A "deceptive act" is "conduct that is likely to deceive a consumer acting reasonably under similar circumstances."  Prukala v. Elle, No. Civ.A.14–92, 2014 WL 1311125, at *3 (M.D. Pa. Mar. 28, 2014) (citing Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009)).  Plaintiffs logically argue that the obvious purpose of a property disclosure statement is to convey to a potential home buyer relevant information about the major components of the house.  Plaintiffs then present valid evidence that a reasonable person would have understood the property disclosure statement to require disclosure of water in the kitchen in such volume as to require that holes be drilled in the kitchen floor to control it.  They go on to assert that a reasonable person would have understood this problem to be "leakage" that should have been revealed on the property disclosure form.  Given this genuine issue of material fact as what a reasonable person in Mr. Curtis's situation would have understood, summary judgment is improper.

19

### 2.   <u>Justifiable Reliance</u>

The Curtis Defendants next assert that Plaintiffs cannot provide any evidence that they justifiably relied upon the Curtises' statement that there was no water leakage in the home when they purchased the residence.[4]  According to the Curtises, after Plaintiffs signed the Agreement of Sale, but before they purchased the home, they retained a home inspector and several contractors to inspect the house for problems.  The home inspector disclosed the negative slope on the property and found several instances of water filtration damage.  Likewise, contractor Reichner told Plaintiffs that the patio pitched toward the house and might have been the cause of water filtration.  Yet, the Curtises argue, Plaintiffs still bought the home, thereby undermining any argument that they justifiably relied on the Defendants' Property Disclosure Statements.

Pennsylvania law requires that "plaintiff[s] alleging violations of the UTPCPL must prove justifiable reliance." <u>Toy v. Metro. Life Ins. Co.</u>, 928 A.2d 186, 202 (Pa. 2007). "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 438 (Pa. 2004) (citing <u>Weinberg v. Sun Co. Inc.</u>, 777 A.2d 442, 446 (2001)).  Evidence of reliance must go beyond simply a causal connection between the misrepresentation and the harm; a plaintiff must "show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." <u>Slemmer v. McGlaughlin Spray Foam Insulation, Inc.</u>, No. Civ.A.12–6542, 2013 WL 3380590, at *6 (E.D. Pa. July 8, 2013) (citing <u>Hunt</u>, 538 F.3d

---

[4]  To the extent the Curtises claim that the Complaint fails to make an allegation of justifiable reliance, that argument is proper in a Rule 12(b)(6) motion and not in a motion for summary judgment when the court can consider matters outside the complaint.

at 222).

Plaintiffs adequately set forth evidence of justifiable reliance sufficient to survive summary judgment review.  First, they note that although Mr. Minnucci remarked that areas around the perimeter of the house slope toward the structure making the home susceptible to water entry, he observed that the "[p]atio appears to be in serviceable condition at the time of inspection," thereby giving them no notice that the patio was the source of the water problem. (Minnucci Report.)  Second, they contend that the kitchen area of the Property is part of an addition to the original house, meaning that there is only a crawl space below the kitchen.  (Pls.' Resp. Opp'n Curtis Mot. Summ. J., Ex. N, Dep. of William H. Kibbel ("Kibbel Dep."), 29:10–22, May 21, 2014.)  In his home inspection report, Mr. Minnucci indicated that the crawl space was "low to enter," "[u]nder Floor insulation restricts viewing," and "[n]o access, this is a visual inspection and we cannot inspect the crawl space due to lack of access."  (Minnucci Report.)  As such, Plaintiffs relied solely on what the Curtises told them about that area. Plaintiffs then had contractors give estimates based only on Mr. Minnucci's identification of problems in the home, but did not have them give estimates on other areas.  (M. Ries Dep. 199:5–25.)  Ultimately, Plaintiffs assert that because of the Curtis Defendants' omission, Plaintiffs did not know that water entered the Property under the kitchen door and did not know of any damage to the floor joists in the crawl space under the kitchen.  They further claim that had this information been disclosed, Plaintiffs would have hired contractors to evaluate the situation in the same way they hired contractors to evaluate the problem areas identified by

Minnucci.[5]  As such evidence is more than sufficient to create a genuine issue of material fact

regarding justifiable reliance, the Court denies the Motion on this ground.

### 3.  **Ascertainable Loss**

In a final effort to obtain summary judgment on the UTPCPL claim, the Curtis

Defendants assert that "the loss which resulted from the alleged justifiable reliance is limited to

that which they seek in their Complaint."  (Def. Curtis Mem. Supp. Summ. J. 19–20.)  Although

Count IV does not contain a specific damages paragraph, the "Wherefore" clause reads that it

seeks "compensatory damages for the Defendants' misrepresentation as to the lack of material

defects in the amount of $46,106.75 and punitive damages in excess of $150,000.00."  (Id. at 20

(quoting Compl.).)  The Curtis Defendants now contend that the cost of replacing the patio is not

an ascertainable loss because it was a pre-existing condition and the Plaintiffs were aware that it

caused the alleged water filtration.

This argument fails to eliminate the remaining issues of material fact.  According to the

evidence produced by Plaintiffs, the Curtises were aware of water leakage under the kitchen door

---

[5]  Plaintiffs rely on Blumenstock v. Gibson, 811 A.2d 1029 (Pa. Super. Ct. 2002) for the proposition that a buyer cannot demonstrate justifiable reliance on the statement of a seller when a reasonable inspection of the property provides the buyer with the information needed to ascertain the existence of problems.  Id. at 1038.  The court in that matter found that the trial court properly concluded "that a reasonable inspection of the property by Buyers and Property Examiners provided the information needed to ascertain the existence of the 'objectionable condition,' i.e., that the sump pumps were necessary to drain the sump pits and that without the two pumps, the pits would overflow with water."  Id.

In the present case, however, Plaintiffs have adduced sufficient evidence to establish that a reasonable inspection of the Property would not have provided the information necessary to ascertain the problem of water seepage through the kitchen door and into the crawl space since the crawl space was inaccessible and the holes drilled in the kitchen floor by the Curtises were apparently covered by a mat.  Thus, Plaintiffs can establish that they justifiably relied on the Curtises' non-disclosure of this condition.

and even drilled holes in the kitchen's ceramic floor to drain the incoming water.  Plaintiffs have also produced evidence that they did not know about this water infiltration, the defectively constructed patio, or the damaged floor joists underneath the kitchen in the crawl space, and that they relied on the Curtises' misrepresentation that there was no such leakage.  Accordingly, the repairs sought by Plaintiffs can reasonably be deemed ascertainable loss.[6]

### 4.    Conclusion as to UTPCPL Claim

In light of the foregoing, the Court finds that Plaintiffs have properly created a genuine issue of material fact on the questions of deceptive conduct, justifiable reliance, and ascertainable loss.  Accordingly, the Curtis Defendants' Motion for Summary Judgment on this claim shall be denied.

### C.    Fraud

Finally, the Curtis Defendants seek a summary judgment ruling on the fraud cause of action against them.  The essence of Plaintiffs' fraud claim is that the Curtises knew that water entered the kitchen door during rainstorms and failed to state this on the disclosure form.  The Curtis Defendants now argue—without citation to the record—that there is an absence of "clear and convincing evidence" that the Curtises made any representation falsely or with the intent to deceive the Plaintiffs or that the Plaintiffs justifiably relied upon any statements by the Curtises.

In order to prove fraud in Pennsylvania, a claimant must prove six elements: "(1) a misrepresentation; (2) material to the transaction; (3) made falsely; (4) with the intent of misleading another to rely on it; (5) justifiable reliance resulted; and (6) injury was proximately

---

[6]  The Curtis Defendants also appear ask the Court to limit damages to the items listed in the Complaint.  As they fail to cite any law that would allow the Court to do so on summary judgment review, the Court declines to address this argument.

caused by the reliance." <u>Bral Corp. v. Johnstown Am. Corp.</u>, 919 F. Supp. 2d 599, 617–18

(W.D. Pa. 2013) (citing <u>Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Co.</u>, No.

Civ.A.10–199, 2010 WL 1714032, *3 (W.D. Pa. Apr. 27, 2010) (citing <u>Santana Prods., Inc. v.</u>

<u>Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123, 136 (3d Cir. 2005))). Under Pennsylvania law,

claims of fraud require proof by clear and convincing evidence. <u>Bral Corp.</u>, 919 F. Supp. 2d at

618 (citing <u>EBC, Inc. v. Clark Bldg. Sys., Inc.</u>, 618 F.3d 253, 275 (3d Cir. 2010)).  "A

misrepresentation is material if it is of such character that . . . had it not been made, the

transaction would not have been consummated." <u>Sevin v. Kelshaw</u>, 611 A.2d 1232, 1237 (Pa.

Super. 1992).

The Curtis Defendants contend that "[t]here is an absence of 'clear and convincing

evidence' that the Curtises made any representation falsely or with the intent to deceive the

Rieses," an "absence of 'clear and convincing' evidence that the Rieses justifiably relied upon

any statements made by the Curtises," and an absence of "clear and convincing" evidence that the

damages claimed by Plaintiffs are "consequential damages related to an alleged

misrepresentation."  (Def. Curtis' Mem. Supp. Summ. J. 21–22.)

The Court finds, however, that the evidence is sufficient to survive summary judgment

and be submitted to a jury to determine whether it rises to the level of "clear and convincing."

As set forth in detail above, Plaintiffs' evidence reveals the following:  the Curtises admittedly

knew that water entered the kitchen and they drilled the drainage holes; the disclosure statements

show no reference to water entering the kitchen; Mr. Curtis testified that he did not disclose the

water issue because he believed it to be water "seepage" that he did not have to reveal, as

opposed to water "leakage" which he did have to reveal; the property inspector stated that he

24

could not enter the crawl space to look for damage; Mr. Ries testified that he hired contractors to look only at the problem areas identified by the inspector; Mr. Ries further testified that had the Curtises disclosed the water problem in the kitchen, he would have hired contractors to provide estimates; and the current repairs that must be made are as a direct result of the Curtises' failure to disclose the problem.  Such evidence could be viewed by a jury as clear and convincing evidence of fraud.

### D.   Conclusion as to the Curtis Defendants' Motion for Summary Judgment

Plaintiffs have more than adequately created genuine issues of material fact as to their various causes of action against the Curtis Defendants.  Accordingly, the Curtis Defendants' Motion for Summary Judgment is denied in its entirety.

## IV.   DEFENDANT AIReS MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant AIReS has also filed a Motion for Summary Judgment seeking dismissal of four claims against them: (1) Plaintiffs' claim under 12 U.S.C. § 2608 (Count I); (2) Plaintiffs' claim under the Pennsylvania Seller Disclosure Law, 68 Pa.C.S. § 7301, et seq. (Count III); (3) Plaintiffs' claim for violation of the UTPCPL (Count IV); and (4) Plaintiffs' claim for fraud (Count VI).  Plaintiffs have filed a Cross-motion for Summary Judgment as to the claim under 12 U.S.C. § 2608 (Count I).  The Court again addresses each claim individually.

### A.   Claim Under 12 U.S.C. § 2608 of the Real Estate Settlement Procedures Act

Both Plaintiffs and Defendant AIReS seek summary judgment on Plaintiffs' claim pursuant to 12 U.S.C. § 2608 of the Real Estate Settlement Procedures Act ("RESPA").  Specifically, Plaintiffs contend that the AIReS March 20th Addendum required Plaintiffs to

purchase title insurance from Larrabee & Cunningham ("Larrabee"), which, according to

Plaintiffs, has their principal place of business at 1500 Walnut Street, Suite 930, Philadelphia,

PA 19102.  Penn Land Transfer Company ("PLTC"), from whom Plaintiffs ultimately bought

title insurance, also has their principal place of business at 1500 Walnut Street, Suite 930,

Philadelphia, PA 19102.  In addition, certain of Larrabee's shareholders are the owners of PLTC,

and certain of Larrabee's employees conduct the operations of PLTC.  Jane Taylor, a realtor

employed by RE/MAX and representing Plaintiffs, testified that she was not at all involved with

Plaintiffs' purchase of title insurance because "[w]e were told we had to use the title company

that AIReS provided," as it specified "in the paperwork."  (Pls.' Mot. Part. Summ. J., Ex. K,

Dep. of Jane Taylor ("Taylor Dep."), 97:4–10, 98:15–17, Oct. 24, 2013.)  Taylor also testified

that the RE/MAX Addendum was a standard addendum prepared for every Agreement of Sale

prepared by her office, but because of the addendum required by AIReS to be attached to the

Agreement of Sale, the RE/MAX Addendum provision regarding title insurance became

irrelevant, and the AIReS requirement applied.  (Id. at 121:23–123:11.)  Ultimately, Plaintiffs

argue that they were bound by the AIReS March 20th Addendum to purchase title insurance from

Larrabee & Cunningham, which is directly prohibited by 12 U.S.C. § 2608.  As such, Plaintiffs

are entitled to damages in the amount of $9,898.50, which is three times the $3,299.50 that they

paid for title insurance.  12 U.S.C. § 2608(b).

 The Court does not find that Plaintiffs have conclusively established a violation of this

provision.  Indeed, the evidence clearly shows that no such violation occurred. Under 12 U.S.C. §

2608:

 (a) No seller of property that will be purchased with the assistance of a federally

related mortgage loan[7] shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company.

(b) Any seller who violates the provisions of subsection (a) of this section shall be liable to the buyer in an amount equal to three times all charges made for such title insurance.

12 U.S.C. § 2608.  In order to establish a violation of the statute, a plaintiff "must prove that she was required directly or indirectly, as a condition to purchasing the property, to purchase title insurance covering the property from a particular title company."  Hopkins v. Horizon Mgmt. Servs., Inc., 515 F. Supp. 2d 649, 654 (D.S.C. 2007) (emphasis added).  The so-called "required-use" provision of § 2608 has been defined in Department of Housing and Urban Development Regulation X:

> Required use means a situation in which a person must use a particular provider of a settlement service in order to have access to some distinct service or property, and the person will pay for the settlement service of the particular provider or will pay a charge attributable, in whole or in part, to the settlement service.  However, the offering of a package (or combination of settlement services) or the offering of discounts or rebates to consumers for the purchase of multiple settlement services does not constitute a required use.  Any package or discount must be optional to the purchaser.  The discount must be a true discount below the prices that are otherwise generally available, and must not be made up by higher costs elsewhere in the settlement process.

24 C.F.R. § 3500.2; Pass v. Capital City Real Estate LLC, 842 F. Supp. 2d 36, 38 (D.D.C. 2012).

Although the case law is sparse, courts have regularly held that a mere provision of a contract, standing alone, cannot conclusively establish a violation of § 2608.  A case arising out of the Northern District of California, addressing whether class certification was proper for an alleged violation of § 2608 based solely on a provision in a form contract, held:

---

[7] There is no dispute that Plaintiffs purchased the Property with the assistance of a federally-related mortgage loan.

27

Fundamental to plaintiffs' motion for class certification is plaintiffs' view that the real estate sales contracts, standing alone, conclusively establish that defendants violated Section 9.  This view, however, ignores the fact that real estate sales are negotiated transactions.  Although the majority of real estate sales may occur pursuant to form contracts, the existence of a term in a form contract does not, as a matter of law, establish that the parties did not bargain for that term.  Nor is it necessarily true that the author of the form contract "required" every term contained therein.

Instead, the Court agrees with defendants that evidence of the negotiations between the parties is relevant to the determination of whether a violation of Section 9 occurred. The language of Section 9, although not entirely clear, supports this conclusion. The section limits its reach to those situations where the use of a particular title insurance company is "a condition to selling the property." 12 U.S.C. § 2608. "Condition" is not a word without ambiguity. See Black's Law Dictionary (9th ed. 2009) ("It is recognized that 'condition' is used with a wide variety of . . . meanings in legal discourse."). Nevertheless, it is most frequently used to describe an explicit requirement of a contractual relationship. See id. (defining "condition" as "[a] future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance"); see also 24 C.F.R. § 3500.2 (defining "required use" to mean "a situation in which a person must use a particular provider of a settlement service" (emphasis added)).  Thus, the statutory language suggests that Section 9 prohibits more than a seller's proposal that the parties use a "particular title company." Similarly, the fact that the seller chose the title insurance provider, while relevant, is not necessarily dispositive of the issue. Rather, the parties' negotiations may demonstrate that the use of a particular title insurance company was not treated as a condition.  At a minimum, defendants have the right to present in their defense evidence that the plaintiffs either suggested the title insurance provision, or accepted it under circumstances indicating that they had no objection to it.

Barger v. EMC Mortg. Corp., No. Civ.A.10-1152, 2011 WL 4712209, *5 (N.D. Cal. Oct. 7, 2011).

In the present case, several factors compel this Court to find that no violation of § 2608 occurred.  First, it is undisputed that Plaintiffs received two addendums.  The RE/MAX Addendum set forth estimated settlement and title insurance charges for Camelot Abstract, but then stated:

28

You are not required to use *Camelot Abstract* as a condition for settlement on your property.  **THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.**

(Pls.' Mot. Summ. J. Ex. D (emphasis in original).)  The AIReS March 20th Addendum, on the other hand, had a small, one-line statement, indicating as follows: "**Title Company:** The company to issue the title insurance policy shall be Larrabee & Cunningham." (Id.)  Reading these contract provisions together does not indicate which provision trumps the other.  Nor does the latter provision indicate that use of Larrabee & Cunningham as the title company is a "condition" that must be satisfied by Plaintiffs in order to complete the sale or that Plaintiffs would not be able to purchase the Property if they did not use Larrabee & Cunningham.

To the extent Plaintiffs rely upon the testimony of Jane Taylor to support their contention that use of Larrabee & Cunningham was a condition of sale, their argument is misplaced.  The full extent of Taylor's testimony on the subject was as follows:

> Q.   Did you have, between the time that the agreement was finally signed on March 23rd, and settlement at the end of May, did you have any conversations with any representative from AIReS?
> A.   No.
> Q.   Okay.  During the course of the negotiations about the concessions that the Rieses wanted, I assume they were conducted also with Nancy [Presti]?
> A.   Yes.
> . . .
> Q.   Who made, to your recollection, the arrangements for the closing?
> A.   I did.  Well, we chose the date.  It was a title company.  We just chose the date.
> Q.   Okay.  What communications do you recall having with the title company, if any?
> A.   I don't recall having any communications with them.  They sent me a notice of settlement, and we went to settlement.  Our financing department may have had, but I didn't personally.
> Q.   Were you at all involved with the Curtises—not the Curtises, with the Rieses

29

|  | purchase of title insurance? |
|---|---|
| A. | We were told we had to use the title company that AIReS provided.  So, no, I wasn't. |
| Q. | Who told you that? |
| A. | It was right in the paperwork. |
| Q. | Okay.  Did you ask Nancy at all about why that requirement was there, or anything about that requirement? |
| A. | I didn't ask her, no. |
| Q. | . . . The paperwork that you are referring to was an addendum required by AIReS? |
| A. | Correct. |

(Taylor Dep. 96:1–97:19.)  Ms. Taylor expressly conceded that her belief that Plaintiffs had to

use the AIReS-provided title company was based solely on the AIReS document, with no

clarification from anyone at AIReS.  Moreover, she never indicated that she informed Plaintiff

that the RE/MAX Addendum was irrelevant in the face of the AIReS Addendum, and she

admitted that she had nothing to do with the purchase of title insurance, meaning that she could

not have influenced Plaintiffs' understanding of the title insurance provisions.

More tellingly, later in her deposition, Ms. Taylor testified as follows:

|  |  |
|---|---|
| Q. | I would like to draw your attention to the second page called Conveyancing Addendum. |
| A. | Uh-huh. |
| . . . |  |
| Q. | Okay.  There is a paragraph at the end regarding the cost of title insurance.  Can you read that photograph into the record? |
| . . . |  |
| A. | You are not required to use Camelot Abstract as a condition for the settlement on the property.  There are frequently other settlement service providers available with similar services, period.  You are free to shop around to determine that you are receiving the best service and the best rate for these services.  I, we, have read this disclosure and understand the Re/Max [sic] is referring me to purchase the above described settlement services from Camelot Abstract, and that the brokers of Re/Max may receive a financial or other benefit as the result of this referral.  Should title be cancelled for an reason, including transaction not going to settlement, there may be a cancellation fee incurred by you, the buyer. |

30

Q.     Is that disclosure statement initialed.

A.     It is.

Q.     By whom?

A.     By the—I'm not sure if the seller initialed it, but it is initialed by the buyer. It's faint.  It kind of looks like the seller's initials.

Q.     So, your understanding is the Rieses initialed the disclosure?

A.     Yes.

Q.     And did you go over that disclosure with them prior to them entering into the Agreement of Sale?

A.     Yes.

Q.     Do you have any reason to understand that they did not understand the provisions that you just read into the record?

A.     I do not.

Q.     Do you have any reason to believe that they don't understand that?

A.     No, I don't.

Q.     So, to your knowledge, you explained to the Rieses that they were free to shop around for title insurance, correct?

A.     As far as—yes.

(Taylor Dep. 114:22–117:15.)  Plaintiffs now identify no testimony from themselves or anyone else indicating that they had a different understanding regarding their title insurance obligation.

Even assuming *arguendo* that Plaintiffs had a reasonable belief that they had to use Larrabee & Cunningham as their title company, Plaintiffs' § 2608 claim fails in that Plaintiffs did not actually purchase title insurance from Larrabee & Cunningham.  Plaintiffs expressly admit they purchased title insurance from Penn Land Transfer Company ("PLTC"), at a cost of $3209.50.  (Compl. ¶ 49.)  Yet, they were permitted to close on the Property, meaning that the use of Larrabee & Cunningham was not a condition of sale.

Finally, the Court finds no merit in Plaintiffs' efforts to argue that PLTC is a title insurance company controlled by Larrabee & Cunningham.  First, PLTC was not the title company listed in the AIReS March 20th Addendum—the only listed entity was Larrabee & Cunningham—meaning that Plaintiffs could not have been required to purchase from PLTC as a

condition of sale.  The mere allegation—unsupported by any evidence of record—that the two

companies share some common shareholders and employees is irrelevant.  Moreover, Plaintiffs

produce no evidence to show that Larrabee Cunningham & McGown, P.C., which is the law firm

with whom PLTC shares its offices, is the same company as Larrabee & Cunningham Real Estate

Services, LLC, which is purportedly the company identified in the AIReS March 20th

Addendum.[8]

In short, the record is clear that, notwithstanding the affirmative language in the AIReS

March 20th Addendum, Plaintiffs were not required, directly or indirectly, as a condition to

purchase of the property, to buy title insurance from an particular title company.  Absent any

genuine issue of material fact on that point, Defendant AIReS's Motion for Summary Judgment

as to Count I must be granted and Plaintiffs' Motion for Partial Summary Judgment as to Count I

must be denied.

**B.**    **Pennsylvania Real Estate Disclosure Law Claim**

Plaintiffs also bring a claim against Defendant AIReS pursuant to 68 Pa.C.S. § 7303.  As

noted above, this statute provides that:

> Any seller who intends to transfer any interest in real property shall disclose to the
> buyer any material defects with the property known to the seller by completing all
> applicable items in a property disclosure statement which satisfies the requirements
> of section 7304 (relating to disclosure form). A signed and dated copy of the property
> disclosure statement shall be delivered to the buyer in accordance with section 7305
> (relating to delivery of disclosure form) prior to the signing of an agreement of
> transfer by the seller and buyer with respect to the property.

68 Pa. Cons. Stat. § 7303.  AIReS now argues that it is not liable because there is no evidence in

_____

[8]  In their Response to AIReS's Motion for Summary Judgment, Plaintiffs concede that
Larrabee and PLTC are distinct legal entities.  (Pls.' Resp. Opp'n Def. AIReS Mot. Summ. J.
12.)

the record that it had actual knowledge that water infiltrated into the kitchen and, therefore, had nothing to disclose.

In response, Plaintiffs argue that the fundamental material defect with the Property was the negative slope of the patio, which meant that every time a rain storm deposited a sufficient amount of water on the patio, water would flow under the kitchen door and into the kitchen. Plaintiff then goes on to contend, without citation to any evidence, as follows:

> By noon on Sunday, August 28, 2011, Hurricane Irene had deposited over 5.5" of rain on Doylestown.  On Monday, August 29th, Presti told AIReS that she would check the Property for hurricane damage on Tuesday, August 30th.  Although Presti now claims that she does not remember whether she inspected the Property, she admits that she knows of no reason why she would not have inspected the Property. She testified that she would have inspected the interior and exterior of the Property and reported her findings to both Curtis and AIReS.

> From this evidence, a factfinder could easily conclude that on August 29, 2011, Presti was concerned that the Property might have been damaged in the hurricane and, irrespective of her current memory lapse, in fact inspected the Property on August 30th.  There is simply no doubt that because of rain deposited by the hurricane and the improper construction of the patio that her inspection of the interior of the house would have revealed a substantial amount of water in the kitchen and possibly other rooms of the Property, facts she certainly would have immediately reported to Curtis and AIReS.

(Pls. Resp. Opp'n AIReS Mot. Summ. J. 16.)

Such an argument completely disregards the summary judgment standard, which requires that once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that an issue of material fact remains. Matsushita, 475 U.S. at 586.  The nonmoving party cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact.  Celotex, 477 U.S. at 32.

Notwithstanding these mandates, however, the sole piece of evidence cited by Plaintiffs is an August 29, 2011 Marketing Update Report from Presti to AIReS wherein she stated, "Check for damage from Hurricane – Tuesday, August 30" and "No new issues [in terms of marketing obstacles], except check for damage to home from hurricane."  (Pls.' Resp. Opp'n AIReS Mot. Summ. J., Ex. D.)  The remainder of Plaintiffs' argument rests on speculative inferences built upon other speculative inferences.  Indeed, in order for a jury to accept Plaintiffs' reasoning, it would have to believe that Presti—a representative of RE/MAX—followed through on her reported intention to inspect the Property after Hurricane Irene, despite her testimony that she could not recall whether or not she actually did so.  It would then have to infer that Presti found water damage in the Property, Presti reported that damage to AIReS, and AIReS had that damage repaired so that it was no longer visible when Plaintiffs saw the Property.  The jury would additionally have to infer that, even though Hurricane Irene was an unusual event in the area that caused damage to a lot of properties that did not otherwise have water issues, AIReS would have been alerted to the particular problem with the grading on the Property and the regular seepage of water into the kitchen.  All of these inferences would have to be made in the absence of any supporting evidence such as inspection reports, emails or letters from Presti to AIReS, estimates or repair bills from contractors, or testimony from anyone involved indicating that any of these events occurred.  As Plaintiffs' vague and speculative allegations are insufficient to create a genuine issue of material fact for any reasonable jury to find that AIReS had knowledge of a material defect at the Property, the Court must dismiss this claim against this Defendant.

Alternatively, Plaintiffs allege that Defendant AIReS violated the RESDL by failing to provide to them a signed and dated copy of the property disclosure statement prior to the signing

34

of the Agreement of Sale, in violation of 68 Pa.C.S. § 7303.  This statutory section provides that "[a] signed and dated copy of the property disclosure statement shall be delivered to the buyer in accordance with section 7305 (relating to delivery of disclosure form) *prior to the signing of an agreement of transfer* by the seller and buyer with respect to the property.  68 Pa. Cons. Stat. § 7303 (emphasis added).  Plaintiffs now allege that they signed the Agreement of Sale for the Property on March 20, 2012, but acknowledged receipt of the AIReS property disclosure statement on March 22, 2012, two days afer signing the Agreement of Sale, making AIReS liable for the damages suffered.[9]

Under Section 7305, however, "[r]eceipt [of a property disclosure statement" may be acknowledged on the statement, in an agreement of transfer for the residential real property or shown in any other verifiable manner."  68 Pa. Cons. Stat. § 7305.  The evidence reveals that the Agreement of Sale, executed by Plaintiffs on March 20, 2012, included the AIReS Addendum, which was executed by Plaintiffs at the same time as the Agreement of Sale.  (Def. AIReS Mot. Summ. J., Ex. C.)  In turn, the AIReS March 20th Addendum included all three Sellers' Disclosure Statements, which means that by executing the AIReS Addendum, Plaintiffs acknowledged receiving the Disclosures prior to signing the Agreement of Sale.  (Id.)

---

[9]  In its Reply Brief in support of its Motion for Summary Judgment, AIReS contends that Plaintiffs never pled this violation in their Complaint adn that Plaintiffs were denied leave to amend their Complaint to include such a claim.  While true that this specific violation of the RESDL does not appear in the Complaint, Plaintiffs did plead a claim for violation of 68 Pa.C.S. § 7303 against AIReS within Count III.  In denying the Motion for Leave to Amend the Complaint, the Court remarked that "as conceded by Defendants, Plaintiffs shall not be barred from producing—during summary judgment proceedings and/or at trial—any additional facts that they believe support their claim for liability under Count III of the Complaint."  (Order of March 25, 2014, ECF No. 62.)  Given that statement, Plaintiffs are not precluded from asserting this additional theory of liability.

Accordingly, this claim fails.

###   C.      Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim

Plaintiffs also bring a claim against Defendant AIReS under the catch-all provision of the UTPCPL.  As set forth above, the catchall provision prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce. 73 Pa. Stat. § 201–2(4)(xxi).  To state a plausible claim under the UTPCPL, the Complaint must allege that: "(1) [Plaintiff] purchased or leased goods or services primarily for a personal, family, or household purpose; (2) [Plaintiff] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL." Baynes, 2011 WL 2181469, at *4 (citing 73 Pa. Stat. § 201–9.2(a)).  The Complaint must also allege that Plaintiff justifiably relied on the deceptive conduct.  See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008).

The dispute between the parties on this claim turns on whether Defendant AIReS engaged in any "fraudulent or deceptive conduct."[10]  Plaintiffs' argument in support of their claim alleges

---

[10]  "There is some uncertainty as to whether a plaintiff must allege the elements of common law fraud to state a claim for deceptive conduct under the UTPCPL's catchall provision." Post v. Liberty Mut. Grp., Inc., No. Civ.A.14-238, 2014 WL 2777396, at *3 n.2 (E.D. Pa. June 18, 2014) (citing Fazio v. Guardian Life Ins. Co., 62 A.3d 396, 406 (Pa. Super. Ct. 2012) ("Pennsylvania law regarding the standard of liability under the UTPCPL catchall is 'in flux.'")).  In Belmont v. MB Inv. Partners, Inc., the Third Circuit determined that a catchall claim does not require proof of common law fraud when a party seeks to bring a claim under the deceptive conduct prong. 708 F.3d 470, 498 (3d Cir. 2013) (predicting Pennsylvania Supreme Court's interpretation of statutory language).  In a subsequently-issued, albeit unpublished, decision, however, the Third Circuit stated that "[t]o establish a claim under this [catchall] provision, [the plaintiff] had to prove the elements of common law fraud."  Taggart v. Wells Fargo Home Mortg., Inc., 563 F. App'x 889, 892 (3d Cir. 2014).  As the Court finds that Plaintiffs have not satisfied even the lower standard for deceptive conduct, this conflict need not be resolved.

as follows:

> It is undisputed that the September 6, 2011 AIReS Property Disclosure Statement provided to Ries does not disclose the fact that water flows under the kitchen door and into the Property during rain storms.  In fact the property disclosure statement discloses no facts at all about the Property even though AIReS knew from the two (2) property disclosure forms completed by Curtis that water entered the basement of the Property.  On this basis alone, the AIReS Property Disclosure Statement given to Ries was incomplete, inaccurate and deceptive.  AIReS also knew that the disclosure statement it provided to Ries was incomplete, inaccurate and deceptive because it did not disclose to Ries the fact that in a rain storm water flowed under the kitchen door and into the Property, a fact known to Presti and conveyed by her to AIReS.

(Pls.' Resp. Opp'n AIReS Mot. Mot. Summ. J. 19.)[11]

As explained in detail above, however, Plaintiffs have provided no evidence that allows any inference that AIReS had any knowledge about the water flow under the kitchen door of the Property during rain storms.  Furthermore, the disclosure statement provided by AIReS is completely crossed-out and is stamped with a notice that "[w]e are a relocation company, and as such, we have never occupied this property.  We make no guarantee, warranty, or representation about the condition of this property."  (Def. AIReS Mot. Summ. J., Ex. C.)  Although AIReS provided the Curtises' disclosure statements to Plaintiffs, it expressly stated that those documents were being given "for informational purposes only," that they represented "the opinions of the individuals or firms who prepared them," and that AIReS made "no representations as to the accuracy of the information given and makes no agreement to undertake or perform any action

---

[11]  Count IV of the Complaint also alleged deceptive conduct with reference to the true owner and seller of the Property.  According to Plaintiffs, "[s]ince the filing of the Complaint, AIReS has delivered to Plaintiffs a Quitclaim Deed conveying its interest in the Property to Plaintiffs.  Plaintiffs, therefore, are no longer pursuing their claims related to the ownership of the Property at the time of sale."  (Pls.' Resp. Opp'n Def. AIReS Mot. Summ. J. 18 n.50; Pls' Resp. Opp'n Presti and Fox & Roach's Mot. Summ. J. 16 n.41.)

recommended in any of the reports." (Id.)  As there is no indication of any efforts by AIReS to mislead or conceal any known material defect, it cannot be held liable for a fraudulent or deceptive failure to disclose that defect.

### D.    Fraud

Finally, Defendant AIReS seeks summary judgment on Plaintiffs' allegation of fraud against it.  Again, as indicated above, in order to prove fraud in Pennsylvania, a claimant must prove six elements: "(1) a misrepresentation; (2) material to the transaction; (3) made falsely; (4) with the intent of misleading another to rely on it; (5) justifiable reliance resulted; and (6) injury was proximately caused by the reliance." Bral Corp., 919 F. Supp. 2d at 617–18 (citing Laufen Int'l, Inc., 2010 WL 1714032, at *3 (citing Santana Prods., 401 F.3d at 136)).  Claims of fraud require proof by clear and convincing evidence.  Bral Corp., 919 F. Supp. 2d at 618 (citing EBC, Inc., 618 F.3d at 275).

Plaintiffs' fraud claim relies entirely on the same conduct that the Court found insufficient to constitute either a violation of RESDL or a violation of the UTPCPL.  As claims of fraud require more demanding proof, the Court likewise finds that Plaintiffs have not established any genuine issue of material fact as to their fraud cause of action.

### E.    Conclusion as to Defendant AIReS

Having thoroughly reviewed the parties' briefs, the Court finds that Defendant AIReS is entitled to summary judgment on all claims against it in Plaintiffs' Complaint.  The evidence clearly establishes that Plaintiffs were not required to purchase title insurance from Larrabee & Cunningham—the company listed in the AIReS Addendum—as a condition to purchasing the Property.  Thus, there was no RESPA violation.  Moreover, with respect to Plaintiffs' claims

under the RESDL, Plaintiffs have not put forth any evidence to suggest either that AIReS was aware of any material defect that it failed to disclose or that AIReS failed to provide a copy of its disclosure form prior to Plaintiffs executing the Agreement of Sale.  Finally, Plaintiffs have failed to adduce any evidence, beyond speculative inferences, to support their UTPCPL claim or their claim of fraud.  Accordingly, the Court grants Defendant AIReS's Motion for Summary Judgment in its entirety and denies Plaintiffs' Motion for Partial Summary Judgment in its entirety.

## V.      MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS FOX & ROACH AND NANCY PRESTI

### A.      Pennsylvania Real Estate Disclosure Law Claim

As with the other Defendants, Plaintiffs allege that Defendants Fox & Roach and Presti violated 68 Pa.C.S. § 7303 by failing to disclose a material defect in the Property.  Fox & Roach and Presti now move for summary judgment on this claim.

The RESDL specifically addresses the liability of a real estate agent under this section, as follows:

> An agent of a seller or a buyer shall not be liable for any violation of this chapter unless the agent had *actual knowledge* of a material defect that was not disclosed to the buyer or of a misrepresentation relating to a material defect.

68 Pa. Cons. Stat. § 7310 (emphasis added); see also Jeffries-Baxter v. Incognito, No. 4101, 2005 WL 2509238, at *4 n.2 (Pa. Com. Pl. Sept. 26, 2005) ("In order to hold an agent liable for concealing a defect from the buyer actual knowledge is required.").

Plaintiffs contend that Presti had actual knowledge of the holes in the floor based upon "strong circumstantial evidence."  (Pls.' Resp. Opp'n. Presti and Fox & Roach Mot. Summ. J.

39

12.)  First, they assert that it is undisputed that there were holes in the kitchen floor and there was no rug on that floor.  (Id., Ex. K.)  They further argue that there was mat left *outside* the kitchen door on the patio and that between the time the Curtises moved out of the Property and Plaintiffs made settlement, Presti had unrestricted access to the Property on numerous occasions for a variety of reasons.  During that time, she had the opportunity to move the mat and see the holes and had a motive to cover up the holes by moving the mat indoors.  "It would, therefore, not be at all unreasonable for a jury to conclude from these undisputed facts that Presti saw the holes, took the mat from the patio and put it down on the floor in front of the kitchen door in an effort to conceal the holes drilled by Craig Curtis."  (Id. at 13.)

Plaintiffs also assert that Presti had actual knowledge that water flowed under the door and into the kitchen.  They claim that the evidence is clear that water flows in from the patio because of the improper construction of the patio, and that the greater the rainfall, the greater the amount of water in the kitchen.  As discussed above, Hurricane Irene deposited over 5.5" of rain on Doylestown in late August 2011, and Presti told AIReS, on August 29, 2011, that she was going to inspect the Property the next day.  Although she could not remember whether she actually did so, in her deposition, she admitted that she knew of no reason why she would not have done so.  Based on this evidence, Plaintiffs contend that "a factfinder could easily conclude that on August 29, 2011, Presti was concerned that the Property might have been damaged in the hurricane and . . . in fact inspected the Property on August 30th.  There is simply no doubt that because of the rain deposited by the hurricane and the improper construction of the patio that her inspection of the interior of the house would have revealed a substantial amount of water in the kitchen and possibly other rooms of the Property. . . ."  (Id. at 14.)

The same problem that befalls this argument as asserted against Defendant AIReS, however, undermines the argument as asserted against Defendants Presti and Fox & Roach—it relies on excessive speculation.  With respect to Presti's knowledge of the holes in the floor, Plaintiffs' argument requires multiple unreasonable inferences and is belied by the concrete evidence of record.  Both Defendants Craig and Susan Curtis admitted that they never had any conversations with Presti regarding water coming in through the kitchen door or the holes they drilled in the kitchen floor.  (C. Curtis Dep. 100:12–18; Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 9, Dep. of Susan Curtis ("S. Curtis Dep."), 21:17–22:6, Feb. 11, 2014.)  Further, Defendant Presti testified that she does not recall seeing a mat on the kitchen floor by the back door and does not remember seeing any holes, but believes that seeing holes in a kitchen floor would have been something that stayed clear in her mind.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 10, Dep. of Nancy Presti ("Presti Dep."), 62:9–24, Feb. 12, 2014.)  Finally, Plaintiff Michael Ries expressly admitted that he has no evidence that Defendants Presti and Fox & Roach knew that water came into the kitchen prior to settlement or that these Defendants knew the Curtises' Property Disclosure Statements were false.  (Defs. Presti and Fox & Roach's Mot. Summ. J., Ex. 11, Dep. of Michael Ries ("M. Ries Dep."), 111:1–112:4, 114:3–8, Feb. 12, 2014.)

In short, for a jury to find that Defendant Presti had actual knowledge of the rain seepage through the kitchen door—the material defect at issue—it would have to disregard the inferences created by the Curtises' and Michael Ries's testimony, disbelieve Presti's testimony, infer without basis that the mat covering the holes was not placed by the Curtises, speculate that Presti must have seen the holes during one of her walk-throughs of the house, infer that she must have known—despite her absence of an engineering or construction background—that the holes were

41

put there to deal with water seepage problems, and conclude that she must have removed a mat from the patio and placed it over the holes in an effort to conceal the problem.  If Federal Rule of Civil Procedure 56 and its interpretive jurisprudence are to mean anything, then they certainly require more than such broad conjecture in order to survive summary judgment.

Plaintiffs' "Hurricane Irene" argument fares no better.  To accept this theory, a jury would again have to conclude that a significant amount of rain actually fell in close proximity to the Property, that Presti—despite her lack of recollection—actually inspected the Property after the hurricane, that upon inspection she actually found water seepage into the kitchen, and that after discovering the water seepage, she took remedial measures to have the damage repaired and the seepage issue covered up.  The jury would have to make these conclusions in the absence of any evidence of how much rain the Property actually received, any evidence that Presti made such inspection, any evidence that she found water damage, any evidence of any repairs, and any evidence of any cover-up efforts.  Although Plaintiffs contend that a "a factfinder could easily conclude" that Presti knew of the water problems, the sheer absence of any deposition testimony, emails, notes, reports, contractor estimates, or weather-related expert evidence would make any such conclusion starkly unreasonable.

While Plaintiffs' theories are certainly a sufficient basis on which to file a complaint and survive motions to dismiss, they do not suffice to withstand summary judgment review under Rule 56.  After months of discovery, Plaintiffs have been unable to come forward with a shred of evidence establishing Presti's actual knowledge of the material defect.  At this juncture, the

RESDL claim against both Presti and Fox & Roach must be dismissed.[12]

**B.** **Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim**

Plaintiffs also bring a UTPCPL claim, under the catchall provision, against Defendants Presti and Fox & Roach.  As twice indicated above, the catchall provision prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" and requires a showing of such deceptive conduct, as well as justifiable reliance on such conduct. 73 Pa. Stat. § 201–2(4)(xxi); Baynes, 2011 WL 2181469, at *4; Hunt, 538 F.3d at 224.

Plaintiffs' argument fails at the first element of deceptive conduct.  Plaintiffs' claim rests solely on the same allegations, detailed above, that Presti knew of the water infiltration problem by the kitchen door, yet covered it up and/or failed to disclose it.  For the same reasons discussed at length in the previous section, the Court finds that Plaintiffs have failed to establish a genuine issue of material fact on this element.  Absent a showing of deceptive conduct, Plaintiffs' UTPCPL claim against Defendants Presti and Fox & Roach must fail.[13]

**C.** **Fraud**

Finally, Plaintiffs again allege fraud against Defendants Presti and Fox & Roach.  These

---

[12]  Plaintiffs also argue that Presti and Fox & Roach are liable for failing to deliver a signed and dated copy of the Property Disclosure Statement prior to their signing of the Agreement of Sale, pursuant to § 7303.  For the same reasons the Court rejected this argument with respect to Defendant AIReS, supra, the Court rejects it as to Defendants Presti and Fox & Roach.

[13]  Presti and Fox & Roach also contend that, even if they made a misrepresentation or omission regarding the water infiltration problem, Plaintiffs have failed to produce any evidence of justifiable reliance since they knew of the problem after having various home inspections done.  For the same reasons the Court rejected this contention with respect to the Curtises, we would be inclined to reject it with respect to Defendants Presti and Fox & Roach.  Nonetheless, as Plaintiffs have failed to make any showing of deceptive or fraudulent conduct by these Defendants, the Court need not reach the issue of justifiable reliance.

Defendants, in turn, move for summary judgment on Plaintiffs' failure to create a genuine issue of material fact either as to the element of a misrepresentation material to the transaction or the element of justifiable reliance.  See Bral Corp., 919 F. Supp. 2d at 617–18.  Plaintiffs, in response, rely on the same allegations with respect to their RESDL claim and their UTPCPL claim.

For the reasons repeatedly outlined above, the Court finds no misrepresentation by Presti or Fox & Roach on which Plaintiffs can rest a claim of fraud.  Moreover, it is well established under Pennsylvania law that a real estate agent owes no duty to conduct an independent inspection of the property.  63 P.S. § 455.606a(I) ("Unless otherwise agreed, a [real estate] licensee owes no duty to conduct an independent inspection of the property and owes no duty to independently verify the accuracy or completeness of any representation made by a consumer to a transaction reasonably believed by the licensee to be accurate and reliable."); see also Bortz v. Noon, 729 A.2d 555, 563 (Pa. 1999) (declining to impose on a real estate agent the duty to investigate the accuracy of a contractor's report made prior to closing where the real estate agent did not have any agency or contractual relationship with the third party).  As such, the Court grants Defendants Fox & Roach and Presti's Motion for Summary Judgment on this claim as well.

**D.**    **Conclusion as to Defendants Fox & Roach and Presti**

Plaintiffs' various theories of liability against Defendants Fox & Roach and Presti rest on a substantial amount of conjecture with no supporting evidence.  As the summary judgment standard requires that Plaintiffs demonstrate the existence of a *genuine* issue of material fact, and as Plaintiffs have failed to do so, Counts III, IV, and V against Defendants Fox & Roach and

Presti must be dismissed.

**VI.      CONCLUSION**

In light of the foregoing, the Court grants the Motions for Summary Judgment by Defendants Fox & Roach and Presti and Defendant AIReS in their entirety, and denies the Motions for Summary Judgment by Plaintiffs and the Curtis Defendants in their entirety.  An appropriate Order follows.